# Exhibit A

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I.     CASE STYLE**

IN THE CIRCUIT COURT OF THE <u>NINTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>ORANGE</u>   COUNTY, FLORIDA

Case No.:_____
Judge: _____

<u>Hester Jordan Burkhalter, Arthur Burkhalter, Brandy Danielle Burkhalter, Airah Grace Burkhalter, Gabrielle Ian Burkhalter</u>

Plaintiff

vs.

<u>Disney Parks and experiences worldwide inc, The Walter Disney Company, Walter Chapek, Robert Iger, George Kalogridis, The Reedy Creek Improvement District, Wayne Schoolfield, Jane Adams, Laurence C Hames, Maximiano brito, Kelly Joe Mistelske, The Sherriffs Department of Orange County Florida, John W Mina, William Van Der Water, Orlando Police Department, Carlos Torres, Donald R Greer</u>

Defendant

**II.     AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim rounded to the nearest dollar $<u>22,000,000</u>

**III.     TYPE OF CASE**     (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- ☐ Condominium
- ☐ Contracts and indebtedness
- ☐ Eminent domain
- ☐ Auto negligence
- ☒ Negligence – other
  - ☐ Business governance
  - ☐ Business torts
  - ☐ Environmental/Toxic tort
  - ☐ Third party indemnification
  - ☐ Construction defect
  - ☐ Mass tort
  - ☐ Negligent security
  - ☐ Nursing home negligence
  - ☐ Premises liability – commercial
  - ☐ Premises liability – residential
- ☐ Products liability
- ☐ Real Property/Mortgage foreclosure
  - ☐ Commercial foreclosure
  - ☐ Homestead residential foreclosure
  - ☐ Non-homestead residential foreclosure

- ☐ Other real property actions
- ☐ Professional malpractice
  - ☐ Malpractice – business
  - ☐ Malpractice – medical
  - ☐ Malpractice – other professional
- ☐ Other
  - ☐ Antitrust/Trade Regulation
  - ☐ Business Transaction
  - ☐ Circuit Civil - Not Applicable
  - ☐ Constitutional challenge-statute or ordinance
  - ☐ Constitutional challenge-proposed amendment
  - ☐ Corporate Trusts
  - ☐ Discrimination-employment or other
  - ☐ Insurance claims
  - ☐ Intellectual property
  - ☐ Libel/Slander
  - ☐ Shareholder derivative action
  - ☐ Securities litigation
  - ☐ Trade secrets
  - ☐ Trust litigation

- ☐ County Civil
  - ☐ Small Claims up to $8,000
  - ☐ Civil
  - ☐ Replevins
  - ☐ Evictions
  - ☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.** **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Non-monetary declaratory or injunctive relief;
☒ Punitive

**V.** **NUMBER OF CAUSES OF ACTION:**
(Specify)

<u>8</u>

**VI.** **IS THIS CASE A CLASS ACTION LAWSUIT?**
☐ Yes
☒ No

**VII.** **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☒ No
☐ Yes – If "yes" list all related cases by name, case number and court:

**VIII.** **IS JURY TRIAL DEMANDED IN COMPLAINT?**
☒ Yes
☐ No

---

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature:   <u>s/ michael patrick gagliardi esq.</u>
      Attorney or party
FL Bar No.:  <u>1002328</u>
      (Bar number, if attorney)
      <u>michael patrick gagliardi esq.</u>
      (Type or print name)
  Date:  <u>08/06/2020</u>

Counsel to the plaintiffs:

Ben Crump PLLC        and        Civil Liberty Law Firm
122 South Calhoun Street             1802 North Belcher, Suite 100
Tallahassee, Florida 32301           Clearwater,, Florida 33765
Attention: Scott Carruthers, Esq.     Attention: Michelle K. Rayner-Goolsby
(850) 224-2020                    (727) 754-4002

Cohen & Marderosian
One Pennsylvania Plaza, Suite 1680
New York, New York 10119
Attention: Mark D. Marderosian, Esq.
(212) 564-1106

## IN THE CIRCUIT COURT, NINTH JUDICIAL CIRCUIT
## ORANGE COUNTY, FLORIDA

--------------------------------------------------------------------------x

| | |
|---|---|
| HESTER JORDAN BURKHALTER, ARTHUR BURKHALTER, BRANDY DANIELLE BURKHALTER, AIRAH GRACE BURKLHALTER (a minor), and GABRIELLE IAN BURKHALTER (a minor), | : <br> : <br> : <br> : <br> : |
| Plaintiffs, | :   Judge: |
| | : |
| - against - | :   **VERIFIED COMPLAINT** |
| | : |
| THE WALT DISNEY COMPANY, DISNEY PARKS AND EXPERIENCES WORLDWIDE INC., ROBERT IGER and WALTER CHAPEK both individually and in their capacities as Executive Chairman and Chief Executive Officer of the Disney defendants; GEORGE KALOGRIDIS both individually and his capacity as President of the Walt Disney World Resort; THE REEDY CREEK IMPROVEMENT DISTRICT ("RCID") an unincorporated landowner's association; WAYNE SCHOOLFIELD both individually and in his capacity as a member of the RCID Supervisory board; JANE ADAMS both individually and in her capacity as a member of the RCID Supervisory board; LAURENCE C. HAMES both individually and in his capacity as a member of the RCID Supervisory board; MAXIMIANO BRITO both individually and in his capacity as a member of the RCID Supervisory board; DONALD R. GREER both individually and in his capacity as a member of the RCID Supervisory board; KELLY JOE MISTELSKE both individually and in his capacity as Security Manager of Resorts at Walt Disney World, THE SHERIFF'S DEPARTMENT OF ORANGE COUNTY FLORIDA, JOHN W. MINA both individually and in his capacity as Orange County Sheriff, WILLIAM VAN DER WATER both individually and in his capacity as Commander of the Orange County Sheriff's Sector VI Command Substation, the ORLANDO POLICE DEPARTMENT and CARLOS TORRES both individually and in his capacity as a captain therein; | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| | : |
| Defendants. | : |

--------------------------------------------------------------------------x

A.   NATURE OF THE CASE

1.     The venerable Black's Law Dictionary defines the "police power" as a State government's authority, reserved thereto by the Tenth Amendment to our federal Constitution, to exercise *reasonable control over persons and property* within its jurisdiction in the interest of the general security, health, safety, morals, and welfare. https://blacks_law.enacademic.com/37693/police_power (emphasis supplied).

2.     This case involves an inexcusably reckless and arbitrary, indeed selectively discriminatory, exercise of that far-reaching authority, more particularly the extraordinary power to rob a tax-paying American citizen of her physical liberty, her personal dignity and good name – committed by uniformed, government-deputized law enforcement officials acting at the direction of a massive multi-national multi-billion dollar for-profit business, whose public face has – for almost a century – been a gregarious, affectionate cartoon mouse named "Mickey." The irony might be funny if defendants hadn't so grievously injured these plaintiffs.

3.     Defendants Disney and uniformed local law enforcement officials acting at its direction and under its authority as a Florida landowner (all parties defendant and their legal relationships identified more thoroughly below) arrested and detained, processed as a narcotics felon and strip-searched a harmless, entirely blameless American great-grandmother, whose only "crime" was her desire to lessen crippling osteoarthritic pain with a doctor-recommended hemp-based oil, while giving her family, including a disabled adult daughter and two adopted pre-teen children, an enjoyable vacation at the "Disney World" entertainment complex near Orlando.  The disgraceful events that animate this lawsuit "pull back the curtain" on the casual cruelty and unpardonable ineptitude that lie at Disney's cold corporate heart.

4.     The Florida Supreme Court once quoted the esteemed Sir William Blackstone in defining the police power as "the *due regulation and domestic order of the kingdom*, whereby the individuals of the state, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood, and good manners, and to be decent, industrious, and inoffensive in their respective stations." Hunter v. Green, 142 Fla. 104, 108, 194 So. 379, 380-81 (Div. B 1940) (emphasis supplied).  Disney's world-famous "Magic Kingdom" most certainly is not a sovereign state – as Blackstone understood King George III's mid-eighteenth

century Great Britain in his seminal *Commentaries on the Laws of England* (1765) – and visitors invited by Disney to enter its vast inland real estate and entertainment empire remain entitled to all the same rights and privileges attendant American citizenship and otherwise governing federal, State and local law.

5.      Disney and its security operatives deprived the first-named plaintiff – Hester Jordan Burkhalter – of her liberty, repeatedly assaulted and traumatized her over a fifteen-hour episode that terrorized not only Hester, but her disabled elderly husband, plaintiff Arthur Burkhalter, their disabled adult daughter, plaintiff Brandy Danielle Burkhalter, and their two adopted pre-teen children, plaintiffs Airah Grace Burkhalter (aged 10) and Gabriel Ian Burkhalter (aged 9).  Brandy suffers from multiple disabilities and requires leg braces to walk.  These disabilities meant nothing to Disney.

6.      Their shameful conduct cannot be undone and ought not be tolerated in a civilized society, so plaintiffs now seek the only remedy governing law permits – money damages reflecting the physical and psychic injuries inflicted on them by a venerated American mega-company, whose security personnel and hired-gun law enforcement agents mindlessly and callously tormented their tightknit family over a legal, locally ubiquitous one-ounce bottle of anodyne therapeutic plant-derived oil – whose ingredients our federal government had decriminalized over *five years earlier* and which *anyone in Florida could have purchased* virtually anywhere in this jurisdiction without a prescription and without legal consequence.

7.      There are no fewer than 10 CBD dispensaries within a few miles of the Magic Kingdom – even some apparently within the Disney-controlled Reedy Creek Improvement District (the "RCID") – and many more were in operation throughout Orange and Osceola Counties when this dispute arose in mid-April 2019.  Nonetheless, Hester and her family – out-of-State *tourists visiting* Florida – were made to suffer.  And suffer they did.

B.   THE PARTIES

8.      At all relevant times, plaintiff HESTER BURKHALTER was a 69-year old North Carolina resident.  Hester is mother to seven children (five adult children and two adopted pre-teens, who also are plaintiffs herein), grandmother to eight (aged 13 to 28)

and great-grandmother to four (aged three to ten, none are plaintiffs here).  She resides in Hickory, North Carolina.

9.     Hester's husband, ARTHUR BURKHALTER, was at all relevant times a 74 year old, Hickory, North Carolina resident.  At all relevant times, Art suffered from a chronic cardiac condition, Type One Diabetes, hypertension, and other co-morbidities that rendered him especially medically vulnerable to undue stress.

10.    Hester and Art were accompanied by their adult daughter, BRANDY DANIELLE BURKHALTER, who suffers from multiple disabilities, in including an autoimmune disorder that requires her to wear leg braces to walk.  Brandy is a plaintiff herein and resides in Hickory, North Carolina.

11.    Hester and Art also were accompanied by their ten-year old adopted son, GABRIELLE IAN BURKHALTER at all times aged eight, and their adopted daughter AIRAH GRACE BURKLHALTER at all relevant times aged nine.  Both are plaintiffs. Herein and reside in Hickory, North Carolina.

12.    Defendant THE WALT DISNEY COMPANY is a diversified international mass media and entertainment conglomerate founded in 1923.  Disney is publicly traded on the New York Stock Exchange and employs approximately 225,000 people in 30 countries.  It's a massive and hugely profitable multi-layered commercial enterprise. For fiscal year 2019, Disney publicly reported 69.57 billion dollars ($69,570,000,000) in gross revenue, 14.868 billion dollars ($14,868,000,000) in operating income, 11.054 billion dollars ($11,054,000,000) in net income; total equity of 193.889 billion dollars ($193,889,000,000).  Its stock is a component of the storied Dow Jones Industrial Average, the Standard and Poor's Dow Jones 100 stock market index, it's ranked 50th as among the fabled Fortune 500, and in 2019 Disney boasted a total market capitalization in excess of 118 *billion* dollars ($118,000,000,000).  Hyperlink to Disney's 2019 Earnings: https://thewaltdisneycompany.com/the-walt-disney-company-reports-fourth-quarter-and-full-year-earnings-for-fiscal-2019/.

13.    Notwithstanding its immense corporate wealth, upon information and belief, Disney has lobbied President Trump and Congress for billions more in *taxpayer dollars* to offset losses it *expects that it might* incur during the Covid-19 viral pandemic currently confronting us (the "Covid-19 pandemic"); taxpayer assistance Disney assuredly will receive as among America's most renowned corporate crown jewels.  No

doubt Disney has lobbyists prowling the State House in Tallahassee as well.  Not content with receiving tens-of-billions of the average American's *after-tax discretionary* entertainment and travel dollars, Disney now demands billions more in *tax dollars* under the federal Coronavirus Aid, Relief and Economic Security (CARES) Act, tax proceeds paid by the same loyal Disney patrons; corporate welfare for among the most profitable companies on the planet, which had almost 14.5 *billion* dollars ($14,500,000,000) *in cash-on-hand* (cash deposits and other readily liquid assets at financial institutions) in March 2020 *as the pandemic began to peak*, according to public filings, which reflects an exceedingly robust 41.86 percent (41.86%) increase over the prior fiscal year.  https://www.macrotrends.net/stocks/charts/DIS/disney/cash-on-hand.  Mickey is the proverbial "mouse that roared," but clearly isn't above feigning financial hardship to inflate its bottom line.

14.     Just as widespread economic hardship precipitated by the Covid-19 pandemic began to peak in mid-April 2020, this self-professed model of our American "family values" furloughed over 100,000 employees *without pay*, while continuing to pay multi-million dollar compensation packages to its top executives, including bonuses connected to entertainment operations that have been effectively moth-balled by the Covid-19 pandemic.  Disney is our State's largest "single site" employer with about 75,000 "cast members" in Florida.

15.     Notably, Disney reportedly furloughed those and other rank-and-file employees to "save" *itself* five-hundred million dollars in labor costs ($500,000,000) each month.  Hyperlink:  https://www.nbcnews.com/news/us-news/disney-furloughs-100-000-theme-park-hotel-workers-amid-coronavirus-n1188236.  That's a startling admission that Disney views its devoted employees as inanimate ledger entries – not human beings – which somehow justified depriving them of a wage at among the most economically vulnerable moments in America's history; an irony Disney's executive suite no doubt popped champagne to celebrate while cutting themselves multi-million dollar bonus checks.  Many such furloughed rank-and-file Disney employees likely now rely on public assistance paid by already beleaguered federal, State and local governments costing – once again – boosting Disney's corporate bottom-line with more taxpayer dollars designed to shield it from pandemic-driven, and otherwise exaggerated market forces.

16.     Defendant DISNEY PARKS AND EXPERIENCES WORLDWIDE INC. ("Disney Parks") is a wholly-owned subsidiary of the Walt Disney Company formed in 1971 and is headquartered at Lake Buena Vista in Orange County, Florida.  It operates entertainment park facilities here in Florida (Walt Disney World, opened in 1971), in California (Disneyland, opened in 1955), France (Disneyland Paris, opened in 1992), Japan (the Tokyo Disney Resort, opened in 1983 and Tokyo DisneySea, opened in 2001), Hong Kong (the Hong Kong Disneyland Resort, opened in 2005), and on the mainland of the Marxist-Leninist People's Republic of China (the Shanghai Disney Resort, opened in 2016), and in Taiwan (LeoFoo Village Theme Park, opened in 1985).

17.     Defendant ROBERT IGER at all relevant times functioned as Disney's chief executive officer until late February 2020, when he was replaced by defendant WALTER CHAPEK.  Upon information and belief, Iger received at least 47.5 million dollars ($47,500,000) compensation in fiscal 2019 and was retained as the company's *Executive* Chairman after he stepped down as Disney's CEO.  Notably, Iger collected 65.6 million dollars in compensation during fiscal 2018.  The aggregate compensatory damages Hester seeks here amount to far less than ten percent (10%) of a single Disney chief executive's annual compensation.

18.     Defendant WALTER CHAPEK has functioned as Disney's chief executive officer since Iger's November 2019 departure.  His Disney-published bio-page professes that Mr. Chapek's "guest-centric approach focuses on ensuring that every aspect of an experience is uniquely Disney and exceeds guest expectations." (emphasis supplied). Plaintiffs' experience certainly was "uniquely Disney" in that it reflected the company's uniquely destructive indifference to the suffering and reputation of its middle class patrons – echoing, perhaps, its manifest affection for repressive mainland China where it succumbed to the controlling one-party National People's Congress, giving autocratic Beijing authority to control everything from Disneyland Shanghai's admission prices to its exhibit content, while paying the notoriously corrupt Chinese regime a large share of the revenue.  Disney: self-professed paragon of our American Values.  Hyperlink: https://www.nytimes.com/2016/06/15/business/international/china-disney.html.  No doubt Disney will capitulate to similar demands vis-à-vis the Hong Kong Disneyland Resort when the so-called "Peoples Republic" completes its illegal military and political domination of the previously semi-autonomous Hong Kong.

19.     In our view, Disney's incomprehensibly reckless decision to reopen Disney World – even to reduced guest capacity – in the midst of a raging viral pandemic, while Florida continues to rack-up record-breaking virus-related hospitalizations and deaths daily, best illustrates its true priority – shareholder value; not guest safety or competent security personnel acting under clear and current protocols.  Corporate Disney clearly has forgotten what young Walt Disney himself learned the hard way when he narrowly survived the so-called 1918 Spanish Flu Epidemic.  Between March 1918 through summer 1919, that epidemic killed between *50 and 100 million people* worldwide starting near the close of the First World War.  Disney contracted the deadly virus while training near Chicago for a volunteer stint in the American Ambulance Corps – then a division of the Red Cross.  Walt convalesced at home, while several dear friends succumbed to the virus at overwhelmed area hospitals.  Upon returning to the United States after nearly a year in France helping to combat the virus as a battered Europe began its lengthy post-war recovery, Walt committed himself and his nascent studio's resources to that effort.  He dedicated his resources to a country and people in need.  HyperLink:

https://www.mouseplanet.com/12624/How_Young_Walt_Disney_Almost_Died_During_a_Pandemic.

20.     Where's that Disney now?  Rather than help combat the deadly Covid-19 Pandemic, the selfless Walt Disney's corporate namesake remains determined to cash-in, despite the inescapable reality that: (1) Americans who flock to Disney World from every corner of our nation will exchange and contract the virus before returning home to infect others in every population center, every suburban community, every rural hamlet in the country; and (2) those millions of foreign tourists who flock to Disney World annually will bring the deadly virus back to their home countries and thereby exacerbate a pandemic that already has infected over 16 million people worldwide and killed almost 650,000.  Disney seems disconcertingly content to turn its hugely popular theme park facilities into gigantic petri dishes for a voracious and deadly pathogen spreading like wildfire in a uniquely vulnerable world.  Every moment Disney operates it functions as a super-spreader event on steroids.

21.     Then again, it's all about money and status at Disney.  Plaintiffs doubt that Disney would have accosted, detained, defamed, and emotionally brutalized them if

they'd been wealthy enough to spend thousands on lavish guest rooms in a posh Disney resort hotel property – rather than sleeping and dining in their recreational vehicle docked in a self-service campground elsewhere on Disney property – and/or had they presented "special treatment" VIP passes at the entrance gate, which are affordable only to the very well-heeled Disney patron.  Such passes cost between $425-$750 each hour and often require a six-hour minimum purchase; bringing their *total daily cost* to between $2,550-$4,500, *excluding* gratuities.  Money talks and it speaks with special fluency in Disney's Kingdom, where only the wealthy can afford to be treated as "Very Important Persons."

22.     Defendant GEORGE KALOGRIDIS both individually and his capacity as President of the Walt Disney World Resort.  Defendant Kalogridis was at all relevant times President of the Walt Disney World Resort, but upon information and belief, in November 2019, he was elevated to the presidency of Disney's Segment Development and Enrichment for Disney Parks, Experiences, and Products.

23.     Defendant KELLY JOE MISTELSKE serves as security manager of resorts at Walt Disney World.  On internet business networking site Linked-In®, Mistelske describes himself as "responsible for all aspects related to security in eleven (11) Walt Disney World Resorts and Disney's Skyliner [Disney World's elevated gondola transport system]." He holds a Class D "unarmed security officer's" license (no. D 2605212) issued by the Florida Department of Agriculture and Human Services.  Based on his own description, Mistelske was at all relevant times personally responsible for ensuring that Disney and its security contractors were properly trained and equipped to execute their role without harming members of the public or otherwise placing them at undue risk.

24.     To avoid confusion and because their tort-based liability is joint and several, defendants THE WALT DISNEY COMPANY, DISNEY PARKS AND EXPERIENCES WORLDWIDE INC., IGER, CHAPEK, KALOGRIDIS, and  MISTELSKE will be referred to collectively as "Disney."

25.     Disney is no ordinary commercial enterprise.  Its central Florida real estate empire was originally conceived and marketed as "Disney World," but its original official name was, and remains, the "Reedy Creek Improvement District" formed as a quasi-municipal unincorporated landowner's association.  According to its website, "the Reedy Creek Improvement District is a 'progressive' form of government, created in

1967 by a special Act of the Florida Legislature [reputedly at the personal request of the iconic Walt Disney himself], the purpose of which was to support and administer economic development and tourism within District boundaries." Hyperlink to RCID Profile: https://jobs.boaf.net/profile/reedy-creek-improvement-district/1401485/ [bracketed language supplied] and https://www.rcid.org.  With administrative offices located on Hotel Plaza Boulevard in Lake Buena Vista, the current incarnation of the RCID encompasses over 25,000 acres (almost 50 square miles) in both Orange County (18,800 acres) and Osceola County (6,200 acres), and serves just 19 landowners, including Disney, its wholly-owned affiliates, and each of the five RCID supervisory board members, whose requisite qualifications include nominal RCID land ownership.

26.     To call Disney's massive 1967 land purchase a "sweetheart deal" doesn't begin to capture the opaque legal processes, "back room dealing" and extraordinary legislative influence by which Disney acquired and developed the RCID.  But that legendary Florida real estate grab also is for another time.

27.     The RCID operates under a special Charter and pursuant to Chapter 189 of the *Florida Statutes, The Uniform Special Districts Accountability Act*.  Hyperlink to RCID Charter: https://www.rcid.org/wp-content/uploads/2015/10/RCID-Charter.pdf.; hyperlink to RCID audited financial statement for fiscal year ending September 30, 2015: https://www.rcid.org/wp-content/uploads/2016/05/2015-RCID-Annual-Financial-Report.pdf.  Notably, the RCID's fiscal year ends on September 29 – the day after that of its *de facto* parent company and/or *de jure* alter ego – Disney.

28.     The RCID is controlled by a five-person supervisory board over whose elections Disney maintains effective control as the RCID's largest landowner by far. Though theoretically a democratically elected body, its board elections are seldom contested and, practically speaking, Disney appoints company-friendly persons to every RCID board seat.

29.     Plaintiffs have named defendant WAYNE SCHOOLFIELD both individually and in his capacity as a supervisor on the RCID board.  Upon information and belief, defendant Schoolfield owns and operates non-party "Schoolfield Properties Inc.," which describes itself on business networking site Linked-In® as "one of the Top Ten Commercial Real Estate Leasing and Sales Developers in the Central Florida Area[.]" Hyperlink:  https://www.linkedin.com/in/schoolfield-properties-inc-63a5781a.

Given Florida's storied real estate sector, that's a bold claim, but Schoolfield's professional expertise and business network no doubt serve Disney well.

30.     Plaintiffs have named defendant JANE ADAMS both individually and in her capacity as a supervisor on the RCID board.  Upon information and belief, defendant Adams also is employed directly by Disney's as its vice president for government relations and also serves as vice president for university relations at the University of Florida.

31.     Plaintiffs have named defendant LAURENCE C. HAMES both individually and in his capacity as a supervisor on the RCID board.  Upon information and belief, defendant Hames is a Florida-barred attorney conducting a general commercial practice in the Orlando area, who describes his firm on business networking site Linked-In® as specializing in "tax planning, wealth preservation, family owned businesses, estate and business planning, business formations and venture structuring." Hyperlink: https://www.linkedin.com/in/laurence-hames-a8467512.  Upon information and belief, defendant Hames "inherited" his board seat from his late father, Sun Bank NA banker Clifford M. Hames, who personally worked with Walt and Roy Disney as they assembled their unique piece of Florida in the 1960s.

32.     Plaintiffs have named defendant MAXIMIANO BRITO both individually and in his capacity as a supervisor on the RCID board member.  Upon information and belief, defendant Brito is a registered architect.  He is a principal at Rhodes & Brito Architects, an architecture and design firm located in Orlando, Florida.  Hyperlink: https://www.linkedin.com/in/maximiano-brito-b1b766a

33.     Plaintiffs have named defendant DONALD R. GREER both individually and in his capacity as a supervisor on the RCID board.  Upon information and belief, defendant Greer serves as President of the RCID board.  Among other powers typical of a municipality or other sovereign governmental entity, the District's Disney-dominated governing supervisory board:

      a.   controls zoning and building codes within the huge RCID;

      b.   is empowered to seek tax-exempt lines-of-credit and to issue tax-free bonds, whose benefits redound to Disney, while their costs are foisted upon Florida's taxpayers;

c.  operates its own emergency services, law enforcement, and even a
limited jurisdiction municipal court system (Reedy Creek Courts);

d.  enjoys the power to engage in virtually unregulated use of experimental
technologies; and

e.  oversees all municipal services on the Disney property, including
utilities, traffic signals, zoning, planning, building code compliance,
fire protection and even pest control.  According to its Comprehensive
Plan 2020 (adopted July 2010): "The Reedy Creek Improvement
District was created by the Florida Legislature in 1967.  It is
coterminous with, and is intended to provide a full range of
governmental and proprietary services for, Walt Disney World Resort."

34.    It couldn't be clearer that RCID was formed to serve Disney, its
operational and developmental agenda.  Hyperlink to RCID Comprehensive Plan 2020:
https://www.rcid.org/wp-content/uploads/2015/06/2020_Comprehensive_Plan.pdf.
As a legal matter in this factual context, Disney and RCID are legally co-extensive and,
therefore, jointly and severally liable to these plaintiffs.  RCID's tortious acts and
failures-to-act (culpable omissions) vis-à-vis facility security are Disney's acts and
omissions as well.  Even when given benefit of the Business Judgment Rule, under
governing law RCID's supervisory board, individual defendants Schoolfield, Adams,
Hames, Brito and Greer are liable to plaintiffs in negligence at least.  Their corporate
mandate explicitly includes overseeing the RCID (and, therefore, Disney's) law
enforcement and security apparatus; the RCID supervisory board functions literally as
the gatekeeper to Disney's Magic Kingdom.  Each board member owed a direct duty to
Disney's business invitees, therefore, to ensure that its chosen security personnel were
properly trained and equipped with a legally current protocol that empowered them to
execute their intended role(s) without harming those invitees or otherwise placing them
at undue risk.  In our view – that is the very least a citizen should expect of a police
officer or other law enforcement personnel, whether public or private.

35.    To avoid confusion and because their tort-based liability is joint and
several, defendants RCID, SCHOOLFIELD, ADAMS, HAMES, BRITO, and GREER will
be referred to herein collectively as "the RCID."

36.     Upon information and belief, Disney and/or the RCID have a contractual relationship with Defendant THE SHERIFF'S DEPARTMENT OF ORANGE COUNTY FLORIDA (the "Sheriff's Department"), whose deputies perform security work in uniform at – among other places – Disney World's various entrance gates.

37.     In fact, the Sheriff's Department is so integrally involved in conducting security operations at Disney that it maintains a dedicated command substation at 2700 Village Services Trail in Lake Buena Vista – *inside* Disney's sprawling compound. As a practical matter, the Department's Lake Buena Vista Command Substation functions as Disney*'s* private security service within the RCID.  Defendant Captain William Van Der Water commands that substation, which "lies solely within the borders of the Walt Disney properties." Hyperlink to Sector VI Command substation website:  [https://www.ocso.com/Services/Operational-Services/Uniform-Patrol-Division/Sector-VI](https://www.ocso.com/Services/Operational-Services/Uniform-Patrol-Division/Sector-VI).  Captain Van Der Water's command encompasses all Walt Disney World theme parks and the Disney Springs Entertainment Complex.  In that capacity, it was among his duties to ensure that personnel under his command were properly trained and equipped to execute their duties without harming members of the public or otherwise placing them at undue risk.

38.     Defendant JOHN W. MINA was acting as the Sheriff of Orange County (collectively "The Sheriff's Department"), Florida at all times relevant to this Complaint.  In that capacity, it was among Mina's duties to ensure that his deputies were properly trained and equipped to execute their law enforcement role without harming members of the public or otherwise placing them at undue risk.

39.     To avoid confusion and because their tort-based liability is joint and several, defendants THE SHERIFF'S DEPARTMENT, VAN DER WATER, JOHN W. MINA shall hereinafter be referred to collectively as the Sheriff's Department.

40.     Defendant CARLOS TORRES was at all relevant times a captain within defendant THE ORLANDO POLICE DEPARTMENT and shall hereinafter be referred to collectively as The Orlando Police.

C.   HEMP versus MARIJUANA

41.     There's broad-based scientific illiteracy in this country regarding the differences between Hemp and Marijuana, CBD and THC.  The *cannabis* species has

two divergent cultivars:  (1) marijuana (incl. subspecies cannabis Sativa **[Linneaeus]**, cannabis Indica **[Lamarck]**, and cannabis Ruderalis **[Janischewsky]** — all contain the psychoactive cannabinoid "Delta-9 tetrahydrocannabinol" (THC), which derives from the precursor tetrahydrocannabinolic acid (THCA), an otherwise non-psychoactive compound found in the trichomes of living cannabis plants (small "hairs" on or other outgrowths from the plant's epidermis).  Its gradual heat-driven decarboxylation (the process by which molecules shed the acid radical COOH [carboxylic acid]) through the plant's growth cycle; post-harvest drying and/or heating the dry biomass converts non-psychoactive THCA into psychoactive THC.  That's marijuana; where in sharp contrast, this case involves what is essentially vegetable oil produced from industrial hemp – *not* marijuana, which oil is rich in the *non-psychoactive* cannabinoid "cannabidiol" (CBD), whose THC content is trivial in our government's view or (as here) non-existent.[1]

42.   Legally and in practice, the marijuana and hemp cannabis cultivars are distinguished almost exclusively by how much of a given volume of their dried biomass is comprised of the aromatic terpenoid THC lipid in its crystalline form, expressed as a percentage of its weight.  Under federal law since 2014, any industrial hemp biomass with a THC content of three percent or less ($\leq 0.030\%$) is not "marijuana" under supreme federal law and, consequently, not a "Controlled Substance" and, therefore, *legal to possess*.  Disney and its third-party security staff, although the latter are ostensibly "law enforcement" officers deputized and thereby vested with broad police powers and situational discretion, by their outrageous conduct vis-à-vis these plaintiffs, demonstrated they don't know the difference between Marijuana and Hemp, between THC and CBD, or governing law pertaining to either.  Those sworn to uphold our laws necessarily must understand basic principles in order to fulfill their sacred oaths and their willful ignorance in this case proved especially destructive.

---

[1]      The decades long politically driven inclusion of industrial hemp on the United States Food and Drug Administration's List of Controlled Substances prohibited extensive peer reviewed domestic scientific research to validate the health claims that many CBD-boosters make.  Since its delisting in 2014, however, private and public research have exploded on – among other potentially therapeutic cannabinoids present in hemp – CBD, which has produced an impressive body of anecdotal evidence suggesting that it functions much as a topical non-steroidal anti-inflammatory and offers similar benefits if ingested daily as a nutritional supplement, it's also believed to reduce anxiety and to function as a sleep-aid.  In this matter, Hester used THC-free CBD-infused oil at her doctor's direction to help alleviate pain, often debilitating pain, in her osteoarthritic knees.

43.     Hemp is not marijuana and industrial hemp-derived CBD doesn't come from marijuana.  As explained more thoroughly elsewhere in this pleading, unlike marijuana, which is hemp's genetic cousin in the *cannabis* family, "industrial hemp" as defined by the 2014 and 2018 federal Farm Bills must contain three percent or less (≤0.030%) THC by weight/volume – that culturally freighted chemical compound affects the central nervous system when ingested and remains a Schedule I Controlled Substance under federal law; some modern high-potency *marijuana* cultivars contain more than thirty percent (30%) by weight of the THC lipid in its crystalline form.

44.     The hemp-derived CBD Oil in Hester's possession contained *zero* THC – *none* – according to its packaging and label, which decisive fact *was borne-out* when the Sheriff's Department first tested it.  For clarity, Hester's CBD could have contained three percent (0.03%) THC by weight and *still have been legal* to possess under federal law. Unfortunately, as explained more thoroughly below, the inherently flawed field tests employed by the defendants couldn't make a discernible chromatic-spectral distinction between THC and CBD, which almost certainly occurred here on the second, wholly unwarranted test undertaken by the Sheriff's Department, much less detect precisely how much (if any) THC was actually present in a given test sample.

45.     CBD-infused products have proliferated the domestic market in every American State, including Florida, since the federal government delisted the "Industrial Hemp" cultivar of the *cannabis* species in the 2014 Farm Bill (formerly the Federal Agriculture Reform and Risk Management Act of 2013).  Recent trend-based consumption modelling studies project that CBD-infused products will be a 22 billion dollar ($22,000,000,000) national market in calendar year 2020.

46.     Hester Burkhalter *purchased no CBD* in Florida, but she *certainly could have done* so freely and just outside Disney's gates.  Plaintiffs passed dozens of CBD sellers on their 10-hour drive to the Magic Kingdom, especially once they reached Florida.  For at least five (5) years before Burkhalter and her family came to Florida in April 2019 and ever since, including when defendants arrested and detained Hester, full spectrum CBD and CBD-infused products have been widely available to every resident Floridian and tourist throughout the State both at brick-and-mortar stores (from Drug Stores and dedicated dispensaries to health food and nutritional supplement retailers)

and through unregulated internet sales.  Defendants surely knew this incontrovertible fact.  Pharmaceutical data aggregator and prescription drug discount broker Towers Administrators LLC d/b/a Singlecare administrators/Singlecare Services LLC has reported that in 2019 CBD sales *in Florida alone* accounted for almost *thirty percent (30%) of the entire country's* one-billion dollars ($1,000,000,000) in total CBD sales at 291 million dollars ($291,000,000).  Hyperlink: https://www.singlecare.com/blog/news/cbd-statistics/.

47.    To better understand that market's scale in comparison to other common agricultural commodities grown here, these statistics show that CBD generates in-State revenue at twice the value of all grapefruits grown in Florida in 2019 and twice the value of all "field crops" cultivated in-State annually (i.e., defined by Florida's Agriculture Department as "corn, cotton, cottonseed, hay, peanuts, soybeans and wheat").  Hyperlink:  https://www.fdacs.gov/Agriculture-Industry/Florida-Agriculture-Overview-and-Statistics.

48.    More important to present purposes, about seventy-five percent (75%) of those sales occurred at CBD dispensaries or other brick-and-mortar retail locations – all subject to warrantless physical inspection and other local law enforcement investigative activity.  But few such investigations have occurred, upon information and belief.  Apparently, defendants deem CBD worthy of a felony arrest only when possessed by elderly, disabled visitors to Florida, while Florida's corporate and human citizens remain free to sell, buy and consume CBD-based products without legal consequence or even police scrutiny in what's clearly become a thriving regional market.

49.    Such discriminatory, selective prosecution of a non-Florida resident should concern Florida's State government in Tallahassee, Orange County administrators, the RCID and most especially Disney itself.  We expect discovery to reveal that very, very few Orange County residents – if any at all – have been arrested, charged with a narcotics felony, strip-searched and jailed by the Sheriff's Department, for possession of a hemp-derived CBD-infused consumer product purchased over-the-counter at a local drug store or anywhere else in this jurisdiction.

D.  ALLEGATIONS COMMON TO ALL CLAIMS

50.     Like any loving grandparents, the Burkhalters cherish their children and grandchildren and, although they have limited financial resources, they wished to treat their disabled adult daughter, Brandy, and two youngest kids, Airah and Gabrielle, to a special vacation at the sprawling Disney World entertainment complex in Florida's Orange and Osceola Counties; a trip that everyone would remember fondly as Hester and Arthur reached their twilight years.

51.     These hardworking middle class Americans scrimped and saved for over two years to purchase the excursion and for enough cash to cover the considerable incidental costs they would necessarily incur over a multi-day stay in a campground inside the Disney World complex, including but not limited to food, gasoline for their family's recreational vehicle, souvenirs, expensive admissions passes to Disney's various facilities and other expenses.  The only souvenir Hester received was a mortifying body cavity search and over 15 tortuous hours in police custody.

52.     Plaintiffs began their trip on April 12, 2019 in their recreational vehicle, which encountered mechanical problems in South Carolina.  Despite this unanticipated expense, Hester and Art paid to have their vehicle repaired and recommenced their long-awaited vacation trip to Disney the following day.

53.     Plaintiffs arrived in Florida on April 13, registered at Disney and parked their recreational vehicle in its Fort Wilderness Campground at Lake Buena Vista.  After sleeping that night in the Campground, plaintiffs awoke bright and early on April 14, 2019.  Hester's children were so excited to begin their long-anticipated Disney adventure that they departed immediately for Epcot Center and Disney's Hollywood Studios in Bay Lake.  They attempted to visit Disney's Animal Kingdom the same day, but heavy rain prevented them.

54.     Throughout the period detailed in this pleading, Hester was carrying a one ounce bottle of CBD oil in her purse, but didn't use any that morning as her doctor had administered two Gelsyn-3 injections (a hyaluronic acid-based joint lubricant) into her knees shortly before plaintiffs began their trip to Florida in order to help manage chronic pain attributable to her advanced osteoarthritis.  Disney security did not search her purse at Epcot's entrance or elsewhere on that first day.

55.     After a day at Epcot, plaintiffs returned to their recreational vehicle parked in the Fort Wilderness Campground.  They awoke the following morning, departed for the "Magic Kingdom" and arrived at the entrance pavilion between 8:30 and 9:00am.

56.     Once at the checkpoint, Disney security personnel demanded that Hester empty her purse.  As she complied, Disney security personnel separated Hester from her husband and children.  Hester had dutifully complied by emptying the entire contents of her purse onto a folding table at the checkpoint when a Disney security officer asked her what a small dropper bottle contained – even though it was clearly marked as containing exclusively CBD Oil with zero percent (0.0%) THC.  Contrary to law enforcement accounts contained in print media, Burkhalter did not refuse to answer when asked whether her CBD oil contained THC – she said that she didn't know.  Moreover, the bottle in question bears a clear label indicating zero THC.

57.     Nonetheless, a Sheriff's Deputy – acting as Disney's paid security officer – elected to conduct a THC field test on the contents of the bottle.  As conclusively demonstrated by a video recorded on a Sheriff Deputy's body-camera (Hyperlink: https://www.mynews13.com/fl/orlando/news/2019/05/24/disney-world-cbd-oil-arrest-body-camera-video), that THC field test indicated – correctly – that Hester's CBD oil *contained zero THC*.  In the subject video, Deputies conducting said test are heard to say [segment time-stamp 30-45 seconds]:

> "*If we test it and it doesn't test positive for THC **then she can have it back**.*"

And just seconds later, when that test *came back negative* for THC, the same deputies openly concluded and are clearly heard to tell Hester:

> "*This **does not** contain THC, it's **not criminal**, it's **not criminal** to have that.*"

58.     While braving this conspicuous and very public intrusion into her federally-protected private medical information, Hester and her husband witnessed other Disney patrons as they passed into the Park, in their thousands, staring at them under Police guard as though they were common street criminals.  Before arriving,

Hester had purchased breakfast for her family, but this unanticipated interruption prevented them from eating.

59.    At one point after administration of the first THC field test, Hester's knees hurt so badly from her lengthy standing detention that she asked permission to sit on a nearby bench.  While seated there in the presence of her worried family, Sheriff's Deputies deployed a drug-sniffing dog on them, further compounding their distress and public humiliation.  The officer then searched Hester's purse again and questioned why she had $1,600 in cash – as though Hester must have been a drug dealer in order to explain having so much cash in her possession.  Though she needn't have done do, Hester explained to the Deputy that it was money they had saved for their trip.

60.    It was then that Sheriff's Deputies – without probable cause or even reasonable suspicion (both dispelled conclusively by a first, negative field test) inexplicably administered a second field test, which indicated incorrectly that THC was present in her CBD Oil.  The Deputy's written characterization of the THC content as "hashish" was inane.  Hashish, as every deputized law enforcement officer surely knows or should know, is a highly concentrated THC resin that bears no resemblance whatsoever to Hester's harmless honey-colored therapeutic CBD Oil.  Hyperlink: https://streetdrugs.org/hashish/.  But those Deputies nonetheless placed Hester under arrest for a narcotics felony they described in their incident report as hashish possession, which was patently false according to their own testing protocol.

61.    Once it became apparent that Hester would be placed under arrest, she distributed a belated breakfast to her worried family and handed her husband the cash they'd worked so hard to save for expenses on their once-in-a-lifetime Disney vacation. But Sheriff's Deputies denied Hester's husband and children entrance to the Magic Kingdom, abruptly labeled them illegal "trespassers," and directed them to return to their recreational vehicle and to vacate Disney property immediately, without Hester.

62.    Once Hester's husband and children departed, another Sheriff's Deputy employed by Disney escorted Hester to a police vehicle, where she was handcuffed behind her back in full view of a busload of her fellow tourists arriving at the park entrance.  As the Deputies handcuffed Hester, a Disney employee commented to the officer "be careful you have a thousand eyes on you."  Hester was instructed to get into

the back seat, but retorted that she would become ill if required to do so.  Her concerns were ignored, and Hester was placed in the backseat alongside a handcuffed adult male.

63.     Just as she'd told the Deputy she would, Hester promptly suffered a mild panic attack, it was already over 85 degrees with high humidity and there was no air conditioning in the rear seat, and she felt unable to breathe.  After she pleaded with a deputy, Hester was permitted to exit the backseat of the vehicle and immediately began to vomit.  The Sheriff's Department edited her distress and panic-induced illness out of the video that it released.

64.     Unconcerned for her welfare, the Deputy instructed Hester to get back into the vehicle, she replied that she couldn't and asked for an ambulance.  Shockingly, the deputy denied Hester the medical assistance she requested.  This interaction, too, was edited out of the video released by the Sheriff's Department.  Finally, after Hester reiterated her need for emergency medical treatment, the Sheriff's Deputies refused again to call an ambulance, but permitted her to sit in the front seat of their vehicle, where she required their assistance to lift her leg into the cabin.

65.     Once they arrived at the Sheriff's Station, Hester was escorted by armed officers into a booking area, where criminal "mug shots" were taken of her.  At this juncture, her arthritic legs were so painful that Hester could barely ascend the low platform on which she was required to stand for her criminal processing.  Shortly thereafter, Hester was escorted into an adjacent room, where she was instructed by other officers to strip naked and to "bend over" for a body cavity search.  And again, her advanced arthritis made it extremely difficult and painful for Hester to comply – but she did her best.  The officers seized her clothes and gave her jail-issued clothing to cover her naked, aching body.  Hester was then escorted to a metal bench where she was left to sit, until a female Deputy finally took a moment to ask her whether she knew what was happening.  Hester doesn't recall precisely how she responded, but does remember a surreal sense of shock at the seemingly interminable ordeal she'd endured.

66.     That deputy also asked whether Hester had someone to call in order to arrange bail, since her criminal processing was largely completed and a decision, apparently, had been made that an arthritic great-grandmother posed no immediate threat to the community.  The deputy called Art, who was hysterical and so upset that he couldn't bring himself to speak with his wife.  The deputy wasn't able to communicate

effectively with Art, because he was so distressed and so she asked Hester for an alternative telephone number to call.  So, Hester gave the Deputy her adult son's number in North Carolina.  During that conversation, Hester overheard the departing Deputy relate to the incoming Deputy her concern that Art sounded like he might have a heart attack.  This disturbing observation only exacerbated Hester's own distress.

67.     In a single and welcome moment of common decency, the female Deputy kept Hester under guard in the same room, rather than placing her in a holding cell. The same Deputy related to Hester's son the information necessary to secure a bail bondsman and, before she departed at the end of her shift, encouraged the incoming Deputy not to place Hester in a holding cell.  Hester was thankful for that Deputy's humanity – humanity utterly absent elsewhere at Disney and among its functionaries. Hester hadn't eaten all day and needed to use the bathroom facilities, which were so foul-smelling and filthy that she couldn't enter without becoming physically ill again.  So she reluctantly abstained.

68.     Her adult son in North Carolina (not a party here) arranged bail with a local bondsman.  Hester remembers being processed-out and released from custody at around midnight – approximately 15 hours after her ordeal began – when her deeply distressed husband, Art, disabled adult daughter Brandy, and minor children, Gabriel and Airah, arrived to fetch her.  Art informed her that they'd been expelled from Disney property as "trespassers" and couldn't return to the campground to sleep or anywhere else in the RCID, but he had located another campground at some distance.  They took some food at a 24-hour McDonald's – Hester's first meager meal of a seemingly interminable and tortuous day.  While Hester and their children ate and waited, Art required several hours to retrieve their recreational vehicle from Disney property and collected his family at McDonald's.  They proceeded to another commercial campground where they tried to get some rest before returning to North Carolina the following day.

69.     The search that led to Hester's arrest was not even arguably a legally justified so-called "Terry Stop" based on reasonable suspicion like one involving a clear drug-related street crime in Miami.  It was (supposedly) a "random" morning security check at an amusement park entrance imposed upon an obviously frail and struggling great-grandmother, who was accompanied by her ailing older husband and three children, including two pre-teens and a disabled adult daughter.  Disney ought not have

stopped her in the first place, but when the Sheriff Department's initial THC field test came back negative, governing law *obligated defendants* to end the encounter immediately, reunite Hester with her worried family, and permit plaintiffs to enter the Magic Kingdom without further incident.

70.    But as plaintiffs' co-counsel – Michele K. Rayner-Goolsby – so smartly observed during a media interview videotaped some days after the incidents at issue here, it seems that Disney and its uniformed law enforcement security personnel were determined to arrest someone – and they inexplicably focused on Hester, a vulnerable, unthreatening older woman with an elderly husband, a disabled adult daughter and two adopted pre-teen kids in tow.  Simple common sense and common decency dictated that: (1) this law enforcement encounter ought never to have occurred at all; and (2) in any event, should have been terminated the moment a police-deployed field test indicated – correctly – that Hester's CBD Oil contained zero THC, just as its label states. This was clearly an unjustified arrest in search of a crime, but only defendants behaved like criminals.

71.    Furthermore, the first field test dispelled any otherwise "reasonable" suspicion" that a crime had been committed, which might have justified a second test using precisely the same or similar technology – much less a felony narcotics arrest, separation from her anxious family, a public hand-cuffing before hundreds of gawking Disney patrons followed by transportation in a squad car to criminal booking and lock-up, where police strip-searched Hester before handing her over to corrections officers (i.e., jailers) who detained her until the following morning.

72.    Plaintiffs expect discovery to reveal that: (1) the Sheriff's Department made public only an incomplete and heavily edited version of the above-described body-camera video; (2) the unredacted video contains other relevant evidence, perhaps including more self-inculpatory statements by the Disney, RCID and Sheriff's Department defendants, tending to support and amplify the allegations plaintiffs make against them here; and (3) other video sources exist, whether police-generated (the Sheriff's Department has required all on-duty officers to wear body cameras since November 2015) or from Disney/RCID-controlled video systems, documenting the same incident from different perspectives, perhaps containing other self-inculpating admissions and behavior by defendants.

73.     They also expect expert testimony to demonstrate that defendants well knew, or certainly should have known, long before they encountered plaintiffs, that their THC field tests: (1) were unreliable and wholly unsuited to use in legitimate law enforcement settings; (2) were notoriously unable to distinguish between THC (a Controlled Substance under supreme federal law) and CBD (not a Controlled Substance); *but that* (3) the Sheriff's Department *continued to deploy* those faulty, legally useless tests anyway, knowing full well that inaccurate results could place completely innocent civilians – like Hester – in potential criminal jeopardy by falsely indicating the presence of a Controlled Substance.  Plaintiffs expect discovery to show that: (1) Florida law enforcement officials have arrested and even incarcerated other American citizens (predominantly low income and/or persons-of-color) on marijuana-related charges based squarely on THC "false positives" produced by the same defective tests; and (2) *did so knowing* that their protocols were faulty, inaccurate, and without legitimate evidentiary value.  Those troubling implications, too, are for another day.  But the historical record is clear and immutable.

74.     To the extent any doubt existed on the subject, a peer-reviewed study published by the prestigious JOURNAL OF ANALYTICAL TOXICOLOGY, Vol. 36, Issue 1, pp. 61-65 [ANDREWS AND PATTERSON] January-February 2012 ("JAT")– over *seven years* before the intolerable tortious episode that animates this lawsuit – made abundantly clear that, when analyzed by expert forensic chemists, trifluoroacetic anhydride acylation (TFAA) reagent field tests like those employed by the Sheriff's Department here *routinely failed to distinguish* between illegal controlled psychoactive marijuana cannabinoids, like THC, and innocuous non-psychoactive therapeutic hemp-derived cannabinoids, like CBD.  Rather, such tests frequently showed substantially identical chromatic-spectral results for both substances, thereby rendering them indistinguishable as an evidentiary matter — and, therefore, rendering the test result practically useless in Florida criminal legal proceedings.  Hyperlink: https://academic.oup.com/jat/article/36/1/61/890089.

75.     That same month, another respected scientific publication, the OPEN FORENSIC SCIENCE JOURNAL, Vol. 5, 4-8 [Kelly, Adanki, and Bagasra] 2012 ("OFSJ") revealed disqualifying defects in the other main field test most commonly used by law enforcement to detect THC – known as the Rapid Modified Duquénois-Levine Field Test – which in summary was found to falsely "detect" THC in common non-cannabis,

indisputably THC-free, plant species like patchouli (an herb related to mint), spearmint (another mint species), and eucalyptus oils.  Hyperlink: https://benthamopen.com/contents/pdf/TOFORSJ/TOFORSJ-5-4.pdf.

76.    Most notably, the OFSJ is *generated by and designed for use within the law enforcement* community.  It's published by the Law Enforcement Standards Laboratory under auspices of the National Standards Bureau (formed by Congress in 1901 and widely considered the country's most authoritative domestic scientific measurement and standards lab).  Especially relevant here is that it assembles critical studies and data *compiled by various law enforcement and criminal justice associations*, which in turn provide information and commentary on *law enforcement equipment standards* developed for the National Institute of Law Enforcement and Criminal Justice of the Law Enforcement Assistance Administration, a body operated by the United States Justice Department.

77.    This Journal is a trusted and commonly used reference source for virtually every competent federal, State and local law enforcement agency in America.  It's a veritable "Bible" of civilian law enforcement's equipment-related best practices, informed by state-of-the-art intra-community research on the efficacy of its common protocols.  The above-cited article warns that inaccurate results (false THC positives) produced by the Rapid Modified Duquénois-Levine Field Test are so common that: (1) its widespread use likely has led to many unwarranted marijuana arrests and convictions; and (2) in any event cannot be trusted to produce evidence "beyond a reasonable doubt" (as required in American criminal proceedings).

78.    Plaintiffs expect discovery to reveal that defendants employed one or both of the above-described tests when evaluating Hester's harmless industrial hemp-derived THC-free CBD oil.  Notwithstanding widely-known, wholly disqualifying flaws in its field tests, the Sheriff's Department continued to deploy them, which in this disgraceful, wholly avoidable, case precipitated a cascade of increasingly injurious tortious acts against Hester and her family.  By their conduct, defendants transformed what Hester and Art had hoped – and had promised their children – would be a delightful journey to the "The Most Magical Place on Earth" into a costly, physically painful and emotionally wrenching horror show, which severely traumatized them all.

79.     Rather than a family vacation to look back upon fondly, Disney and its security operatives in the Sheriff's Department treated plaintiffs to a fifteen-hour long emotional ordeal that included Burkhalter's improper arrest and detention on baseless felony narcotics charges, while her ailing husband, disabled adult daughter and two pre-teen children watched and waited in horror, unable to understand the circumstances or to help her, uncertain of her fate and, therefore, uncertain of their own fates as well.

80.     That ordeal in turn has become a living nightmare that Hester and her family have relived, and will continue to relive again and again throughout their lives, because Disney and its reckless functionaries made it so.  Adding insult to injury, Disney took the gratuitous step of summarily ejecting Hester and her family from its facilities in perpetuity as "trespassers," thereby cementing the defamatory stigma and unmerited humiliation precipitated by defendants' disgraceful conduct.

81.     Hester, who is partially disabled herself by severe chronic osteoarthritis, seeks $6 million in damages for personal injury she suffered at the defendants' hands, together with $12 million in punitive damages.  Her husband, Art, and their three children, whose close familial relationship to Hester and physical proximity to her unlawful man-handling by armed, uniformed law enforcement personnel doing Disney's dirty work, seek $1 million each for the emotional distress they suffered witnessing and enduring the arrest, physical detention and suffering of their innocent, ailing matriarch together with $3 million punitive damages reflecting defendants' outrageous conduct.

82.     These infuriating events received considerable national, even some international, press attention – and rightfully so.  Disney is an Globe-spanning multi-billion dollar entertainment and hospitality conglomerate, whose treatment of its guests commands public scrutiny.  Its assets top 125 billion dollars ($125,000,000,000) in aggregate value.  Given that Disney's parks collectively receive on average over 150-million (150,000,000) visitors annually (over 20 million (20,000,000) to its sprawling RCID entertainment complex alone, it's inexplicable that such a wealthy and sophisticated business empire failed: (1) to *establish and train* its security contractors to follow a coherent and legally current entrance gate security protocol; and (2) if Disney truly wanted to exclude illegal substances from its premises, to equip those contractors with accurate and reliable substance tests in order to avoid victimizing – as they did

here – innocent park patrons based on THC testing kits they knew or clearly should have known were inherently defective, both empirically and at law.

83.   Its irresponsible indifference to the serious harm that could (and in this case *did*) befall innocent Disney patrons as a result, coupled with grossly negligent and legally reckless behavior by the Sheriff's Department combined to inflict painful and lasting injury on plaintiffs, who wanted nothing more than to enjoy Disney's famous entertainment facilities as a family.  Instead of the "Most Magical Place on Earth," Disney treated Hester to physical violation, torturing her family members with uncertainty and fear.  Moreover, it's never apologized or offered recompense.

84.   Their reckless and intentional tortious conduct should deeply concern Disney's management – not to mention its institutional and rank-and-file shareholders to whom the company's public image is especially critical – and presents a broader public concern both for Orange County and to the law enforcement agencies whose personnel Disney retains or employs.  To many Americans, Disney *is synonymous with Florida* and so plaintiffs' ordeal reflects poorly on the Great Sunshine State, too. Rightfully so, it was an altogether appalling episode.  It ought never have happened.  But it did and the perpetrators must be held to account in damages.

85.   Despite understandable public outcry at what Disney surely must understand by now was a wholly avoidable operational failure on its part, plaintiffs have received no apology or other acknowledgement of the wrongdoing that harmed them, much less an offer to compensate them for their enduring injuries.  Consequently, plaintiffs have turned to the Florida Civil Courts and will plead their case to a jury; they're eager to have whole truth known and expect complete success on the merits.

86.   Even though both houses of Congress and our President directed that industrial hemp and its derivatives, including CBD oil, be removed from the Food and Drug Administration's "Controlled Substances" list, thereby rendering it legal to possess, and expressly prohibited State law bans against its interstate transportation, defendants nonetheless arrested, detained, charged, strip searched and incarcerated Hester on the strength of a field drug test that: (1) on its first application *indicated that no THC* was present, as expressly stated on the bottle's ingredient label; and (2) the Sheriff's Department knew – and through Sheriff Mina himself – later *acknowledged*

*was unreliable* in distinguishing between hemp-derived (CBD) and marijuana-derived substances (THC).

87.     Shortly after Burkhalter's unlawful arrest and illegal detention, Sheriff Mina himself still falsely claimed that it "was a legal arrest," but went on to acknowledge that "I think maybe looking back - maybe that should have been handled it in a different manner[,]" and further *admitted on the record* that "We do have field kits that test for THC *but it seems like they're not very reliable[.]*" (emphasis supplied).  He further stated that "Our priorities are more dangerous drugs," and that "Moving forward we're probably going to have our deputies check with a supervisor or contact someone on their legal team before making a CBD arrest." After defaming Hester by calling her felony narcotics arrest a "legal" one (which necessarily and falsely implies her possession of an illegal controlled substance) Sheriff Mina (apparently clueless to the irony) commented that he'd like his Department to have *accurate field tests* for illicit drugs. https://www.fox13news.com/news/sheriff-responds-to-cbd-oil-arrest-case. Unfortunately, Sheriff Mina's grossly belated flash of lucidity on this critical law enforcement issue came only after his Deputies terrorized and brutalized Hester and her family.  Perhaps Hester's ordeal – and his lawsuit – will help to ensure that others don't suffer the same ignominious fate.

88.     Delighted as Hester was to serve as defendants' whipping girl for an ill-conceived and ineptly executed Disney security policy, she much rather would have enjoyed the family vacation she and her husband saved for two years to purchase – defendants ensured that every hard-earned penny they spent purchased only pain and trauma.  But Sheriff Mina's admissions on this point don't stand alone.  Other culpable law enforcement officials acknowledged their reckless disregard of Hester's rights.

89.     Upon information and belief, neither the Orlando Police Department nor its Captain Carlos Torres was involved in Hester's physical arrest or tortious maltreatment within the RCID.  Nonetheless, Captain Torres inexplicably took it upon himself to comment publicly thereon despite having, upon information and belief, zero *personal first-hand knowledge* of the facts – in doing so, he called Hester a criminal, thereby defaming her again and perpetuating her victimization.  He told the press that in "this particular case, the deputy encountered a substance that *he knew to be illegal. He tested it and at that point, he developed probable cause to make the arrest[.]*"

https://heavy.com/news/2019/05/hester-jordan-burkhalter/. (emphasis supplied).
Frankly stated, that's an illogical and demonstrably false, defamatory assertion and,
given the source, looks and sounds strikingly like a failed effort to cover his law
enforcement colleague's (i.e., the Sheriff's Department) backside.

90.     As a threshold matter, if the deputy in question "knew" on sight that
Hester's CBD was an "illegal substance" he surely needn't have deployed a THC field test
at all – it's circular reasoning to argue that a Deputy's supposed "plain sight" *knowledge*
of a substance's alleged illegality warranted a test to *confirm that knowledge* and *only
thereby provide* probable cause to arrest.  If it's the Captain's unspoken contention that
the arresting officer "knew" Hester's hemp-oil contained illegal CBD, which in turn gave
him probable cause to test for THC, the argument fails again.  As a threshold matter, *lest
we forget*, defendants purported to arrest Hester for *hashish* possession – *not CBD*
possession – so the state of Florida law regarding CBD is arguably irrelevant to Hester's
claims.  Furthermore, the first test deployed by the Deputy conclusively *showed zero*
THC, which by definition makes Torres's statement *doubly* false.

91.     Clearly the law enforcement officers involved had no idea what they were
doing in this deplorable encounter; they neither sought nor received coherent command
guidance on how to proceed; even had they sought such guidance it appears that neither
the Captain van de Water's command nor Sheriff's Department more generally was
equipped to provide it, and their inexcusable ignorance on the subject precipitated
Hester's 15-hour long victimization.

92.     Second, even assuming the packaging or appearance of the CBD gave the
deputy "reasonable suspicion" on which to investigate further and/or probable cause for
a seizure and/or testing of Hester's CBD, that probable cause "went up in smoke" the
moment his chosen *first field test yielded no THC.*  As quoted above, audio
accompanying live video footage of the incident proves beyond doubt that a first police
test of the CBD Oil showed zero THC; the arresting officer audibly *states precisely that*
and affirmatively declares Hester's possession of it *legal.*

93.     Once their chosen THC field test yielded a negative result and a deputy
expressly declared it legal for Burkhalter to possess her CBD, no Constitutionally
legitimate basis existed to hold Hester and/or to justify a second test, much less Hester's
arrest and public humiliation, culminating in her lengthy detention, including felony

criminal processing, a degrading, wholly unwarranted, strip and body cavity search. The actions of the Sheriff's Department against this innocent American great grandmother were willfully ignorant, unwarranted on the facts, and executed in a reckless and grossly negligent manner as contemplated in the Florida Statutes, Section 768.72(2)(a), which warrants punitive damages against every defendant.

94.     Defendants punctuated Hester's nightmare by making her strip naked for a body cavity search before law enforcement officers.  Again, Hester was 69 and in chronic arthritic pain when this disgraceful battery occurred.  Her terror and humiliation were only compounded by the knowledge that her husband – Arthur – suffered from chronic heart disease, Type One Diabetes and hypertension, and that her predicament was causing him to become dangerously distressed and symptomatic.

95.     As Hester was being arrested, detained and undergoing a humiliating body cavity search, she worried – understandably – that her circumstances might cause Art to suffer a potentially debilitating or even fatal cardiac episode.  This emotionally wrenching concern about her ailing husband merely exacerbated Hester's terror and compounded the injuries inflicted upon her by the defendants.  When they were finally permitted to speak by phone during Hester's criminal processing at the Orange County Sheriff's Disney-dedicated command station, Art was so distraught that he wept, justifiably and understandably, at his dear wife's dreadful predicament.  Disney and its security operatives had rendered Hester's loving husband powerless to help her.  The terror they instilled in him was deeply damaging and wholly unnecessary, which renders it legally intentional.  It was unvarnished cruelty.  We expect that any police-generated recording of that heart-rendering episode was quickly destroyed by the Sheriff's Department or met the same fate pursuant to a pre-existing record retention policy.

96.     These profoundly troubling circumstances mattered not in the least to Disney and its operatives in the Sheriff's Department.  They made no accommodation whatsoever for Art despite his ailments, for Hester's terrified disabled adult daughter, Brandy, or Hester's adopted pre-teen children, Airah and Gabrielle.  All were left to wonder what had happened to Hester and were tortured by uncertainty for over 15 hours before she was finally released on a $2,000 bond at midnight the following morning and ejected onto an unfamiliar street in midnight darkness.  Such despicable behavior cannot stand – defendants acted in a manner antithetical to public order,

utterly contemptuous of Hester's Constitutionally protected civil rights, in flagrant breach of the duties owed to every plaintiff as a Disney business invitee, and severely harmful to the victims.  Disney may fancy itself a sovereign Kingdom, but it lies within the United States, where such heedless emotional brutality remains illegal and punishable in damages.

97.    In the same vein, plaintiffs find it shockingly callous – not to mention duplicitous – that a fabulously wealthy company, which built its worldwide brand over nearly a century in which Disney curated a uniquely American popular culture (raking-in hundreds-of-billions in the process) in no small part by presenting itself as a model of our treasured American cultural and moral sensibilities, would dismiss this deeply distressing episode as nothing more than "a law enforcement matter." Instead, Disney and its fellow defendants acted against Hester not only without a sound legal basis, but did so within defendant Chapek's carefully-curated "guest-centric," ostensibly family-oriented theme park where Disney's reckless functionaries only magnified its rank hypocrisy and moral bankruptcy.  This is not a "Mister Toad's Wild Ride slip-and-fall case" – it is a matter that demands thoughtful self-examination and genuine institutional reckonings as among these defendants.  While their ignorance and ineptitude continue unremediated, other innocent Disney patrons remain vulnerable to the same maltreatment that plaintiffs suffered at their hands.  This is among the principal reasons that significant punitive damages are so appropriate here – to deter future tortious conduct and motivate remedial behavior, while sending a broader message that such conduct is intolerable in a civilized society.

98.    Disney revealed itself here as not just another cold-blooded corporate behemoth; it's one that carefully targets American families (most especially minor children) as entertainment content and proprietary theme-product consumers, but – when those customers suffer at its hands – displays cold-hearted disinterest when its reckless behavior visits devastating repercussions on innocent Americans credulous and enough to trust that Disney would conduct business in keeping with its own professed "American" values.  Plaintiffs suppose it shouldn't surprise that in the Magic Kingdom, profits and political expediency outweigh morality and common decency every time, because Disney clearly values gold over the Golden Rule.  *It's difficult to imagine a scenario more anathema to Disney's expressed moral values than the unlawful arrest*

*and public humiliation, armed detention and strip search, and charging as a narcotics felon of an arthritic great-grandmother over a legal, medically therapeutic product widely available throughout this jurisdiction.*

99.    The Sheriff's Department and Orange County officials presumably think that by dropping the charges against Hester as "unsuited to prosecution" they've immunized themselves against liability for terrorizing her and her family.  Plaintiffs would very much like to know what post-event change-in-circumstance abruptly transformed Hester's allegedly felonious drug-related crime, which supposedly warranted her arrest, detention, physical assault and public humiliation, unworthy of prosecution.  Plaintiffs respectfully submit that by "unsuited to prosecution," the District Attorney's Office and Sheriff's Department have implicitly acknowledged that Hester's alleged "crime" was unworthy of arrest in the first instance, without foundation in law or fact.  But their desperate back-peddling came too late.

100.    As noted above, Sheriff Mina later acknowledged in press interviews that his office had changed its policies in handling CBD-related police encounters, but only after Hester formally announced her intention to bring this lawsuit.  Even if the Sheriff's Department's post-event policy changes constitute "subsequent remedial measures" as contemplated under 90.407 of the Florida Evidence Code, they remain admissible against defendants to prove: (1) defendants controlled the procedures and protocols pursuant to which Hester was arrested and emotionally brutalized; and (2) appropriate procedures and precautionary measures easily could have – and *should* have – been put in place years ago, which would have prevented the entire tortious episode.

101.    In the same vein, it's important to note that throughout the relevant period, CBD was a primary and very public subject of the State's highest elected legislative bodies.  Notably, on March 9, 2019 the Florida Senate unanimously passed a bill that would modify the state's hemp licensing program to ensure unrestricted CBD retail sales could continue Statewide.  The same legislation passed by supermajority in the Florida House on March 11, 2019 – *over a month before* Hester's family arrived in the State.  Defendants surely knew these facts and understood that our Governor had expressed an intention to sign the legislation into State law.  Hyperlink: https://www.flsenate.gov/Session/Bill/2020/1876/?Tab=VoteHistory.

102.   Moreover, given CBD's well-known and absolutely obvious ubiquity throughout Florida and then-existing state-of-flux in State law on the subject – on which defendants surely will depend in mounting a futile legal defense here – it's all the more reckless that they failed: (1) to make appropriate changes to their procedures and protocols in dealing with CBD-related police encounters long before Hester and her family reached Florida; and (2) to alert the general public and out-of-State visitors about *Florida's refusal to respect federal law* pertaining to CBD and its emerging new hemp laws.  Instead, these same government authorities wanted it both ways:  They wanted to foster a robust CBD market, while retaining power to punish its participants at will.  They allowed a vigorous and rapidly growing market in CBD-infused products to thrive in their jurisdiction in the years before Hester's ill-fated trip, while doing nothing whatsoever to educate their staffs about the resulting legal double standard and/or its knock-on effects when the Sheriff's Department arbitrarily decided to "enforce the law" against an unsuspecting participant *in the very market its deputies fostered*, *even defended* in their capacities as local law enforcement.  As explained above, defendants increased the likelihood that their institutional failures would harm innocent civilians by deploying technically inaccurate and legally useless THC detection tests.  Hester, her husband and their children, were victimized when defendants' collective incompetence and willful ignorance intersected in an otherwise routine random bag security check.

103.   This honorable Court should disregard any such "CBD illegality" defense as nothing more than substance-free *post hoc* rationalization for a disgraceful tortious episode precipitated by selective prosecution and willful ignorance.  Once again, *lest we forget*, defendants purported to arrest Hester for *hashish* possession – *not CBD* possession – so the state of Florida law regarding CBD is arguably irrelevant to Hester's claims.  But even if it's relevant, a jury could reasonably conclude that defendants were more interested in maximizing local CBD sales and corporate income tax collections therefrom than in enforcing laws that might curtail them.

104.   We expect discovery to reveal that: (1) defendants well understood these facts; and (2) did nothing to regulate or even monitor CBD-related consumer transactions in their jurisdiction; and which (3) leads to the inescapable conclusion that they took such a *laissez faire* approach, because CBD sales generated sales tax collection on which public law enforcement budgets depend, including the Sheriff's Department.

As noted above, CBD sales in Florida accounted for *over a quarter* of our entire nation's $1 billion in CBD sales in 2019 at approximately $291,000,000, on which Florida collected no less than 17.5 million dollars ($17,500,000) in sales taxes in that fiscal year.

105.    Upon information and belief, those Sheriff's Department employees who participated in the tortious conduct described above, functioned legally as Disney's employees and/or otherwise acted as its agents (with actual or apparent legal authority) when they assaulted, falsely imprisoned, physically abused, terrorized and defamed Hester.  Their actions are legally attributable to Disney and the RCID, who authorized them to conduct security operations on Disney property.  Disney's retort in various print media that Hester's abuse was just "a police matter" doesn't immunize it from liability. Quite the contrary, it merely confirms that Disney: (1) authorized the Sheriff's Department to act in its behalf; and (2) is utterly indifferent to the harm its policies and practices visited upon innocent park patrons.  Punting to its authorized agents merely highlights Disney's direct culpability as their most influential principal.

106.    As noted above, Disney's collective corporate operations are valued at over 125 billion dollars ($125,000,000,000).  Plaintiffs and their counsel find it inexcusable that a company with such unfathomably vast resources failed so catastrophically to: (1) develop a legally current security protocol in a jurisdiction where CBD-infused products were obviously ubiquitous and had been for several years; and (2) ensure that its security personnel were properly trained to implement that protocol in order to prevent precisely such destructive tortious episodes.  Although Disney functions in many respects as a quasi-sovereign city-state within Florida, its special status doesn't render it immune to this jurisdiction's otherwise applicable statutory and common law. Furthermore, plaintiffs reserve their right to assert additional claims based on the civil rights violations they endured at Disney's hands.

107.    This shocking case presents, yet again, a disturbing example of blindly predatory capitalism gone wrong – a vast commercial enterprise so detached from its humble customers, so complex and myopically profit-focused that it severely injured them, rather than spending a little time behaving respectfully toward the average Americans whose hard-earned dollars made Disney so fabulously wealthy.  The time has come to send Disney a stern message:  the American People, their legal rights and personal dignity, are more important than its corporate balance sheet.

108.   Disney reportedly spends over $50,000 each and every night on a self-celebratory fireworks show lasting 18-20 minutes.  Hester respectfully suggests that training its security personnel properly would have cost far less; notably, the aggregate compensatory damages she and her traumatized family members seek herein amount to less than what Disney spends on self-adulating pyrotechnics in just four months.

E.   <u>ENUMERATED CLAIMS</u>:

<u>FIRST CAUSE OF ACTION AGAINST DEFENDANTS
DISNEY, RCID, and THE SHERIFF'S DEPARTMENT</u>

(Hester Burkhalter / assault and battery)

109.    Plaintiffs incorporate herein by reference all allegations set forth above as though they had been restated and realleged here in full.

110.   Disney and its security contactors, including those employed by the Sheriff's Department, assaulted Hester every time they threatened to touch her person without her permission or adequate legal cause to restrain her.

111.   Each such assault matured into a tortious battery when Disney and its security contactors actually touched Hester, which occurred dozens of times during the more than fifteen hours Hester spent in the unlawful custody of the Sheriff's Department, including but not limited to her arrest, restraint and hand-cuffing, her placement into a police vehicle, processing and finger-printing, detention and associated body cavity search.

112.   Each assault was intentional, involved physical force, and created in Hester a reasonable fear that she was in imminent peril of a battery.

113.   Each such assault matured into an intentional infliction of a harmful and offensive physical contact on Hester's person (i.e., a battery) in connection with each assault described above.

114.   Hester demands a judgment awarding her $6 million in compensatory damages and $12 million in punitive damages against defendants, jointly and severally. Plaintiffs will demonstrate by clear and convincing evidence that defendants committed intentional misconduct and/or conduct that constitutes "gross negligence" as contemplated in Sections 768.72(a) and (b), respectively.

SECOND CAUSE OF ACTION AGAINST DEFENDANTS
DISNEY, RCID, and THE SHERIFF'S DEPARTMENT

(Hester Burkhalter / false arrest and imprisonment)

115.    Plaintiffs incorporate by herein reference all allegations set forth above as though they had been restated and realleged here in full.

116.    Disney and its security operatives intentionally detained Hester Burkhalter unlawfully and against her will.

117.    The procedures by which Disney and its security personnel detained her were unreasonable and unwarranted by the circumstances.

118.    Even assuming her arrest was proper, Hester was improperly detained thereafter and thereby falsely imprisoned.

119.    Hester was injured by her false arrest and imprisonment.

120.    Hester demands a judgment awarding her $6 million in compensatory damages and $12 million in punitive damages against defendants, jointly and severally. Plaintiffs will demonstrate by clear and convincing evidence that defendants committed intentional misconduct and/or conduct that constitutes "gross negligence" as contemplated in Sections 768.72(a) and (b), respectively.

THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS

(Hester Burkhalter / defamation by implication)

121.    Plaintiffs incorporate herein by reference all allegations set forth above as though they had been restated and realleged here in full.

122.    Her public arrest and detention before other park patrons; her criminal processing and detention in the presence of others; Disney's imposition of a park ban and trespass charge against Hester and family; the failure by defendants to correct public misapprehension by apologizing combined to constitute defamation by implication.

123.    Their conduct tended to harm Hester's reputation in a manner that lowered the public's estimation of her in the community and deterred third persons from associating or dealing with her.

124.    Hester requested an apology within days of the incident, but defendants elected to exacerbate her injuries by: (1) remaining silent and thereby promoting the

public misapprehension that she was a narcotics felon; and (2) repeatedly reiterating in the print media and elsewhere that her arrest was proper.

125.    Hester demands a judgment awarding her $6 million in compensatory damages and $12 million in punitive damages against defendants, jointly and severally. Plaintiffs will demonstrate by clear and convincing evidence that defendants committed intentional misconduct and/or conduct that constitutes "gross negligence" as contemplated in Sections 768.72(a) and (b), respectively.

FOURTH CAUSE OF ACTION AGAINST DEFENDANTS
DISNEY, RCID, and THE SHERIFF'S DEPARTMENT

(All plaintiffs  / intentional infliction of emotional distress)

44.    Plaintiffs incorporate by reference hereat all allegations set forth above as though they had been restated and realleged here in full.

45.    The offending conduct committed by Disney and it security operatives was intentional and reckless in that they knew or certainly should have known that it would cause Hester Burkhalter and her family members to suffer emotional distress as a result.

46.    Taking all circumstances into consideration, their conduct was outrageous in that it exceeded the bounds of common decency and should be considered intolerable in a civilized society.

47.    Their outrageous conduct caused all plaintiffs to suffer emotional distress.

48.    The emotional distress suffered by the plaintiffs was severe.

49.    Hester demands a judgment awarding her $6 million in compensatory damages and $12 million in punitive damages against defendants, jointly and severally. Plaintiffs will demonstrate by clear and convincing evidence that defendants committed intentional misconduct and/or conduct that constitutes "gross negligence" as contemplated in Florida Statutes, Sections 768.72(a) and (b), respectively.

50.    The remaining plaintiffs demand a judgment awarding them $1 million each in compensatory damages and $3 million each in punitive damages against defendants, jointly and severally.  Plaintiffs will demonstrate by clear and convincing evidence that defendants committed intentional misconduct and/or conduct that constitutes "gross negligence" as contemplated in Sections 768.72(a) and (b), respectively.

### FIFTH CAUSE OF ACTION AGAINST DEFENDANTS
### DISNEY, RCID, and THE SHERIFF'S DEPARTMENT

(Hester Burkhalter / malicious prosecution)

51.     Plaintiffs incorporate by reference hereat all allegations set forth above as though they had been restated and realleged here in full.

52.     Defendants commenced an original criminal proceeding against Hester Burkhalter by arresting her, detaining her, and filing felony narcotics charges against her in Orange County (the "Burkhalter Criminal Proceeding").

53.     The above-named defendants herein intentionally caused commencement of the Burkhalter Criminal proceeding.

54.     The decision of the Orange County District Attorney to dismiss those charges as "unsuited to prosecution" constituted a *bona fide* termination thereof in Burkhalter's favor.

55.     No probable cause existed to commence the Burkhalter Criminal Proceeding.

56.     Defendants acted with actual or constructive (legal) malice in commencing the Burkhalter Criminal Proceeding.  Upon information and belief, defendants never intended to prosecute Hester, but put her through the disgraceful horror show detailed above to create the false impression that they were actively policing Disney's gates.

57.     Hester Burkhalter suffered personal injury as a result of the Burkhalter Criminal Proceeding.

58.     Hester demands a judgment awarding her $6 million in compensatory damages and $12 million in punitive damages against defendants, jointly and severally. Plaintiffs will demonstrate by clear and convincing evidence that defendants committed intentional misconduct and/or conduct that constitutes "gross negligence" as contemplated in Sections 768.72(a) and (b), respectively.

### SIXTH CAUSE OF ACTION AGAINST DEFENDANTS
### DISNEY, RCID, and THE SHERIFF'S DEPARTMENT

(all plaintiffs / negligence)

44.     Plaintiffs incorporate by reference hereat all allegations set forth above as though they had been restated and realleged here in full.

45.     As the landowner and business operator on the subject premises, Disney owed a non-delegable duty to the plaintiffs, as its business invitees, to provide them with reasonably safe premises, including reasonable protection against intentionally injurious conduct committed by third parties.

46.     Disney could retain, as it did, an independent contractor to provide the required security for its guests, but it was nonetheless vicariously responsible for any negligence or other wrongdoing by its contractor(s) in providing such services based on the non-delegable nature of its landowner's duty under governing law.

47.     The tortious behavior in which Disney and its security operatives engaged was – at the very least – grossly negligent.  The absence of a coherent and legally current security protocol wasn't merely a tortious failure on the part of the Sheriff's Department, but a failure on Disney's part as well.  Its non-delegable duty-of-care to its business invitees – like plaintiffs – makes Disney a primary tortfeasor under a "business invitee" negligence analysis.

SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS
DISNEY, RCID, and THE SHERIFF'S DEPARTMENT

(Hester Burkhalter / negligent hiring)

48.     Plaintiffs incorporate by reference hereat all allegations set forth above as though they had been restated and realleged here in full.

49.     Disney was require by law to conduct an appropriate investigation of the personnel it retained to enforce security protocols at its entertainment facilities.

50.     Disney failed to conduct an appropriate investigation of the Orlando Police Department and Orange County Sheriff's Department employees whom it hired to conduct security at its facilities in Orange County, Florida.

51.     An appropriate investigation would have revealed that: (1) Orlando Police officers and Orange County Sheriff's Department deputies were unsuited to the particular duties that Disney hired them to perform.

52.     Under the circumstances, Disney acted unreasonably in hiring said police officers and Sheriff's deputies in light of the information it knew or that would have been revealed by an appropriate investigation.

53.     Among other things, an appropriate investigation would have revealed to Disney that: (1) the police officers and Sheriff's deputies it ultimately hired lacked appropriate training or investigative protocols to conduct competent and legally inoffensive evaluations of incoming Disney patrons; (2) appropriate topic-specific training was necessary to ensure the accurate and even-handed application of the law to park patrons; and (3) the Sheriff's Department, Disney's authorized agent in park security matters, knowingly employing defective and inaccurate narcotics testing equipment to search patrons at its entrance gates.

### EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS
### DISNEY, RCID, and THE SHERIFF'S DEPARTMENT

(children and husband / negligent infliction of emotional distress)

54.     Plaintiffs incorporate by reference hereat all allegations set forth above as though they had been restated and realleged here in full.

55.     By virtue of their direct familial relationship to the first-named plaintiff, Hester, and their physical proximity to her during the above-described events, each of these claimants suffered a discernable physical injury caused by psychological trauma attributable to witnessing the tortious abuse heaped by defendants on Hester.

56.     Each of these claimants was involved in the underlying events by virtue of their direct familial relationship to Hester and their physical proximity to her during the tortious episodes detailed elsewhere in this Complaint.

57.     Plaintiffs demand a judgment awarding them $1 million each in compensatory damages and $3 million each in punitive damages against defendants, jointly and severally.  Plaintiffs will demonstrate by clear and convincing evidence that defendants committed intentional misconduct and/or conduct that constitutes "gross negligence" as contemplated in Sections 768.72(a) and (b), respectively.

Dated:  July 22, 2020 at
        Tallahassee, Florida

PRAYER FOR RELIEF:

WHEREFORE, the plaintiffs respectfully request judgment against the various defendants, jointly and severally, as follows:

A.      On the First Cause of Action, asserted against the named defendants jointly and severally, and sounding in assault and battery, Hester Burkhalter requests a money judgment in an amount to be determined at trial, but in no event less than $6 million in compensatory damages and $12 million in punitive damages;

B.      On the Second Cause of Action, asserted against the named defendants jointly and severally, and sounding in false arrest and imprisonment, Hester Burkhalter requests a money judgment in an amount to be determined at trial, but in no event less than $6 million in compensatory damages and $12 million in punitive damages;

C.      On the Third Cause of Action, asserted against the named defendants jointly and severally, and sounding in defamation by implication, Hester Burkhalter requests a money judgment in an amount to be determined at trial, but in no event less than $6 million in compensatory damages and $12 million in punitive damages;

D.      On the Fourth Cause of Action, asserted against the named defendants jointly and severally, and sounding in intentional infliction of emotional distress, Hester Burkhalter requests a money judgment in an amount to be determined at trial, but in no event less than $6 million in compensatory damages and $12 million in punitive damages;

E.      Also on the Fourth Cause of Action, asserted against the named defendants jointly and severally, and sounding in intentional infliction of emotional distress, Arthur Burkhalter, Brandy, Airah, and Gabriel Burkhalter each requests a money judgment in an amount to be determined at trial, but in no event less than $1 million in compensatory damages each and $3 million in punitive damages each;

F.      On the Fifth Cause of Action, asserted against the named defendants jointly and severally, and sounding in Malicious prosecution, Hester Burkhalter requests a money judgment in an amount to be determined at trial, but in no event less than $6 million in compensatory damages and $12 million in punitive damages;

G.      On the Sixth Cause of Action, asserted against the named defendants jointly and severally, and sounding in negligent hiring, Hester Burkhalter requests a

money judgment in an amount to be determined at trial, but in no event less than $6 million in compensatory damages and $12 million in punitive damages;

H.      On the Seventh Cause of Action, asserted against the named defendants jointly and severally, and sounding in negligence, Hester Burkhalter requests a money judgment in an amount to be determined at trial, but in no event less than $6 million in compensatory damages and $12 million in punitive damages;

I.      Also on the Seventh Cause of Action, asserted against the named defendants jointly and severally, and sounding in negligence, Arthur Burkhalter, Brandy, Airah, and Gabriel Burkhalter each requests a money judgment in an amount to be determined at trial, but in no event less than $1 million in compensatory damages each and $3 million in punitive damages;

J.      On the Eighth Cause of Action, asserted against the named defendants jointly and severally, and sounding in negligent infliction of emotional distress, Arthur Burkhalter, Brandy, Airah, and Gabriel Burkhalter each requests a money judgment in an amount to be determined at trial, but in no event less than $1 million in compensatory damages each and $3 million in punitive damages each;

K.      Whatever additional and/or different relief the Court deems appropriate on the evidence presented.

Respectfully submitted by:


Ben Crump PLLC                          Civil Liberty Law Firm
Chief Counsel to plaintiffs             Co-counsel to plaintiffs


By:     _/s/ Benjamin L. Crump____      By:   /s/Michelle K. Rayner
        Benjamin Crump, Esq.                  Michelle K. Rayner-Goolsby
        Scott Carruthers, Esq.                1802 North Belcher, Suite 100
        122 South Calhoun Street             Clearwater, Florida 33765
        Tallahassee, Florida 32301           (727) 754-4002
        (850) 224-2020


        Cohen & Marderosian


By:     _/s/Mark D. Marderosian_
        Mark D. Marderosian*
        Stephen L. Cohen
        One Pennsylvania Plaza, Suite 1680
        New York, New York 10119
        (212) 564-1106

- Mr. Marderosian has been admitted to practice in New York State and its federal courts since 1990 and in Washington D.C. since 1996.  He is not admitted to practice in Florida, but will seek admission *Pro Hac Vice* on motion pursuant to Rule 2.510 of the Florida Rules of Judicial Administration exclusively for purposes of this action.  He thanks the Court in advance for its consideration of his Rule 2.510 application.